UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

HEWITT A. GRANT, II,
      Petitioner,

v.                                  Case No. 8:19-cv-2954-KKM-SPF

SECRETARY, DEPARTMENT
OF CORRECTIONS,
      Respondent.

_____

**ORDER**

Hewitt A. Grant, II, a Florida prisoner, timely[1] filed a Petition for Writ of Habeas

Corpus under 28 U.S.C. § 2254 challenging his state court convictions based on alleged

errors of the state courts and the prosecution and alleged failures of his trial counsel. (Doc.

1.) Having considered the petition, (*id.*), the response in opposition, (Doc. 8), and Grant's

reply, (Doc. 13), the petition is dismissed-in-part regarding the grounds over which this

---

[1] A state prisoner has one year from the date his judgment becomes final to file a § 2254 petition. *See* § 2244(d)(1). This one-year limitation period is tolled during the pendency of a properly filed state motion seeking collateral relief. *See* § 2244(d)(2). Grant's judgment was affirmed on November 3, 2017. (Doc. 9-6, Ex. 13.) His judgment became final 90 days later, on February 1, 2018, when the time to petition the Supreme Court of the United States for a writ of certiorari expired. *See Bond v. Moore*, 309 F.3d 770, 774 (11th Cir. 2002). After 132 days of untolled time, Grant filed his postconviction motion on June 14, 2018. (Doc. 9-7, Ex. 19, p. 14.) The postconviction motion remained pending until the appellate court's mandate issued on July 12, 2019. (Doc. 9-9, Ex. 25.) By that time, Grant had filed a petition for writ of habeas corpus on August 27, 2018. (Doc. 9-9, Ex. 26.) That petition remained pending until the state appellate court's mandate issued on October 18, 2019. (Doc. 9-11, Ex. 33.) Grant allowed another 34 days of untolled time to elapse before he filed his § 2254 petition on November 22, 2019. (Doc. 1, p. 19.) A total of 166 days of untolled time elapsed after his state judgment became final. Grant's petition is therefore timely.

Court lacks jurisdiction and is denied-in-part regarding the other grounds. Because reasonable jurists would not disagree, Grant is not entitled to a certificate of appealability.

## I.   BACKGROUND

### A. Procedural History

The State of Florida charged Grant with sixty-nine counts of animal fighting or baiting, two counts of managing a property used for training animals for fighting, one count of possession of equipment for fighting or baiting, twelve counts of cruelty to an animal, and one count of possession of a firearm by a convicted felon. (Doc. 9-2, Ex. 1, pp. 267-80.) The counts of cruelty to an animal were misdemeanors and the other counts were felonies. (*Id.*)

A state court jury found Grant guilty of all counts related to animals, animal fighting or baiting, and property or equipment related to animal fighting, totaling eighty-four counts. (Doc. 9-3, Ex. 1, pp. 491-503.) For the felony counts, the state trial court imposed an overall sentence of twenty years in prison followed by twenty-five years of probation. (Doc. 9-3, Ex. 1, pp. 599-601, 631-658.) For the misdemeanor counts, the state trial court sentenced Grant to time served. (Doc. 9-2, Ex. 1, pp. 599, 656.) The state appellate court per curiam affirmed the convictions and sentences. (Doc. 9-4, Ex. 5.)

After his trial, Grant pleaded nolo contendere to the count of possession of a firearm by a convicted felon. (Doc. 9-5, Ex. 9, pp. 377-398; 399-403.) The state trial court

sentenced him to nine years in prison, concurrent with his sentence on the other counts. (*Id.*, pp. 395-96.) The state appellate court per curiam affirmed the conviction and sentence. (Doc. 9-6, Ex. 13.)

Grant moved for postconviction relief under Florida Rule of Criminal Procedure 3.850. (Doc. 9-7, Ex. 19, pp. 14-60.) The state court denied his motion. (Doc. 9-8, Ex. 19, pp. 114-20.) The state appellate court per curiam affirmed. (Doc. 9-9, Ex. 22.) Grant filed a second Rule 3.850 motion alleging newly discovered evidence, which was also denied. (Doc. 9-11, Ex. 34.) The state appellate court per curiam affirmed the denial. (*Id.*, Ex. 37.) Grant's petition for writ of habeas corpus was dismissed. (Doc. 9-9, Exs. 26 & 28.) The dismissal was affirmed by the state appellate court. (Doc. 9-11, Ex. 32.)

### B. Facts Presented at Trial

Detective James Scarborough, a certified animal cruelty investigator who had studied dogfighting and had experience using dogs for hunting, was dispatched to a property in Fort Meade, Florida, on October 21, 2014. (Doc. 9-3, Ex. 1c, pp. 356-57, 379, 478-79.) A structure on the property had been a bar or club but was no longer in operation. (*Id.*, p. 380.) A privacy fence surrounded the back section of the property. (*Id.*) Detective Scarborough heard dogs barking behind the fence. (*Id.*) He posted a notice for the owner of the dogs to contact him. (*Id.*, p. 381.) That evening, he received a call from Grant. (*Id.*,

p. 382.) Grant agreed to meet Detective Scarborough at the property at 5:00 p.m. the following day. (*Id.*, p. 399.)

The next morning, Detective Scarborough learned that a veterinarian was going to the property. (*Id.*, p. 400.) Detective Scarborough arrived at the property between noon and 1:00 p.m. (*Id.*) He asked Grant for permission to search the property and Grant signed a consent to search form. (*Id.*, p. 401.) Detective Scarborough observed some dogs in kennels and some dogs tied with logging chains, which he explained are heavy chains typically used for binding equipment or logs onto a semi-trailer. (*Id.*, pp. 359-60, 404.) Detective Scarborough entered the building and saw marks on the floor that led him to believe a dog fighting ring (about 16 square feet in size) had been set up and removed. (*Id.*, pp. 405, 418.) He observed small pieces of carpet remnants on the floor and a red substance that looked like blood on the wall. (*Id.*, p. 405.) Officers obtained a search warrant for the property. (*Id.*, pp. 405-06.) Crime scene technician Kistler collected samples of the apparent blood from the floor and wall. (*Id.*, pp. 464, 466.)

Detective Scarborough found records showing that Grant owned another property in Bartow, Florida. (*Id.* p. 416.) Detective Scarborough went to that property with Sergeant Thomas Dixon and Deputy Rick Anderson. (*Id.*, p. 418.) At the Bartow property, Detective Scarborough observed a set of two-by-fours with plywood nailed to them and a roll of carpet the same color as the carpet remnants he saw in the Fort Meade building.

(*Id.*) Detective Scarborough then obtained a search warrant for the Bartow property. (*Id.*, p. 420.)

On the Bartow property, Detective Scarborough observed more dogs with heavy logging chains. (*Id.*, p. 423.) He also found saline solution and IV bags, which can be used to treat dogs dehydrated from physical exertion, and wound care items. (*Id.*, pp. 428, 446.) He also found photographs of dogs that appeared to show how many fights the dogs had won or how long the dogs lasted in fights. (Doc. 9-3, Ex. 1c, pp. 433-34, 437-38.) Detective Scarborough located a duffel bag with dog pedigrees, pictures, and a book about dogfighting. (*Id.*, p. 435-36.) He stated that the book has been "banned" in the United States and is highly valuable in the dogfighting world. (*Id.*, p. 483.)

Detective Scarborough observed what looked like blood on the walls, door, and carpet of an area set up as a fighting ring. (*Id.*, p. 439-40.) Detective Scarborough also located a treadmill of the type commonly used to train dogs for dogfighting. (*Id.*, pp. 361, 368-69, 442.) He also found a harness and weight sled on the Bartow property. (*Id.*, 370-71, 442.) He explained that a person will place weight on the sled, attach the sled to a harness on the dog, and make the dog pull the sled. (*Id.*, p. 370.) Detective Scarborough stated that the wood panels and rolls of carpet at the Bartow property were taken but were later thrown away because the Sheriff's Office lacked sufficient space to store them. (*Id.*, p. 473.)

All 69 of the dogs at the properties were removed. (*Id.*, pp. 379, 448.) Each dog was removed individually and assigned a number. (Doc. 9-3, Ex. 1d, p. 506.) A picture and written description were recorded for each dog. (*Id.*, p. 506.) Detective Scarborough stated that, based on his experience, the injuries to Grant's dogs were not consistent with hunting them. (Doc. 9-3, Ex. 1c, pp. 485-86.)

Dr. Abbe DeGroat was the staff veterinarian at Polk County Animal Control who examined all 69 dogs. (Doc. 9-3, Ex. 1d, pp. 498, 506.) During the examinations, the dogs were photographed and any injuries were documented. (*Id.*, pp. 507, 510-11.) As part of her evaluation, Dr. DeGroat assigned each dog a body condition score based on a scale of 1 to 5. (*Id.*, p. 512.) A score of 1 indicated an ideal body condition and a score of 5 indicated an emaciated body condition. (*Id.*) Dr. DeGroat assigned 20 dogs a score of 1, six dogs a score of 2, one dog a score of 2.5, 24 dogs a score of 3, two dogs a score of 3.5, and 12 dogs a score of 4. (*Id.*, pp. 634-35.)[2]

Dr. DeGroat noted similar conditions for many dogs, including fleas and poor coat quality, scars or injuries consistent with fighting, and abrasions. (*Id.*, pp. 512-622.) On some dogs, she noted conditions such as splayed feet from confinement in a space that was too small, sores or scarring from lying on hard surfaces, and missing or broken teeth. (*Id.*,

---

[2] This number accounts for 65 of the dogs. It appears that Dr. DeGroat did not assign a score to some puppies.

pp. 515, 517-18, 523, 527, 530, 534, 550, 570-71, 579, 582, 585, 587-88, 594, 598-99, 601, 604-06, 616, 620.) On a few dogs, she noted conditions such as worms, missing hair that had been rubbed off the dog's neck by a collar, and teeth that had been filed down. (*Id.*, pp. 517, 527, 546, 570, 574, 587, 591-94, 597, 601, 604, 637.) Dr. DeGroat explained that a dog's teeth may be filed to prevent the dog from injuring another dog while fighting or during breeding. (*Id.*, pp. 520-21.) She also noted that some dogs had heavy collars or chains. (*Id.*, pp. 512-13, 535-37, 540, 543, 546, 549, 552-53, 555-57, 565, 571.)

Dr. DeGroat did not believe the injuries to Grant's dogs were consistent with hunting injuries. (*Id.*, p. 624.) She testified that bite mark patterns from hunting and dogfighting are "completely different." (*Id.*, p. 663.) Dr. DeGroat concluded that all 69 dogs were used or bred for fighting. (*Id.*, pp. 626-27.)

Grant testified that he bred the dogs for hunting. (*Id.*, p. 707.) He stated that although he had not hunted with dogs for about four years, he rented his dogs to friends for hunting. (*Id.*, pp. 707-09.) Often, he stated, he would receive payment in form of meat from the animals that the dogs caught. (*Id.*, pp. 709-10.) He stored the raw meat in freezers on both properties. (*Id.*, p. 780.) Grant stated that he could not afford a veterinarian, but he took care of the dogs and bought them food, medications, vitamins, and de-wormers. (*Id.*, pp. 711-12.) Grant testified about the medical treatment he gave the dogs and denied filing down the teeth of any dog. (*Id.*, pp. 852, 872-902.) He testified that he used the

treadmill and weight sled to build the dogs' endurance and strength for hunting purposes. (*Id.*, p. 724; Doc. 9-3, Ex. 1e, p. 770.) Grant testified that the book had information about bloodlines and hunting. (Id., pp. 760-62.)

Grant stated that the carpet was from remodeling the building on the Fort Meade property. (*Id.*, p. 776.) Grant testified that the marks on the floor that Detective Scarborough believed to show an outline of a dogfighting ring were from taking down a wall and from ripping up carpet during remodeling. (*Id.*, pp. 791-92, 798-99.) He stated that he used the wooden panels and carpet to create an area for preparing animals that had been caught hunting, which led to blood being deposited on the carpet and walls. (*Id.*, pp. 776-80.) He also stated that the blood could have come from transporting meat from hunting that he was defrosting. (*Id.*, p. 793.)

Grant testified that he used the logging chains because they were durable and that the dogs' collars were not heavy. (*Id.*, pp. 814-16.) He testified that the photographs Detective Scarborough believed to contain information about the dogs' fighting history actually contained information about how many hogs the dogs had killed or how long they took to catch a hog. (*Id.*, pp. 834, 969-70.) He testified that the scarring was from hunting and from injuries that occurred in the dogs' pens, and denied having the dogs to fight. (*Id.*,

pp. 898-901, 908-09.) But Grant admitted that in 2006, an injunction was issued preventing him from owning animals in Polk County. (*Id.*, p. 967.)[3]

Grant called crime scene supervisor Amy Losciale. She described the Bartow property, including kennels, portable doghouses, posts with chains used to house and secure the dogs. (Doc. 9-3, Ex. 1d, pp. 687-93.)

## II.    STANDARD OF REVIEW UNDER SECTION 2254

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) governs this proceeding. *Carroll v. Sec'y, DOC*, 574 F.3d 1354, 1364 (11th Cir. 2009). Habeas relief under the AEDPA can be granted only if a petitioner is in custody "in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). "The power of the federal courts to grant a writ of habeas corpus setting aside a state prisoner's conviction on a claim that his conviction was obtained in violation of the United States Constitution is strictly circumscribed." *Green v. Sec'y, Dep't of Corr.*, 28 F.4th 1089, 1093 (11th Cir. 2022).

Section 2254(d) provides that federal habeas relief cannot be granted on a claim adjudicated on the merits in state court unless the state court's adjudication:

---

[3] Although not addressed at the trial, it appears that the charge of possession of a firearm by a convicted felon stemmed from the recovery of two handguns during the execution of a search warrant on one of the properties. (Doc. 9-5, Ex. 9, pp. 393-94.)

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

For purposes of § 2254(d)(1), the phrase "clearly established Federal law" encompasses the holdings only of the United States Supreme Court "as of the time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. 362, 412 (2000). This section "defines two categories of cases in which a state prisoner may obtain federal habeas relief with respect to a claim adjudicated on the merits in state court." *Id.* at 404. First, a decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Id.* at 413.

Second, a decision involves an "unreasonable application" of clearly established federal law "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* The AEDPA was meant "to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell*

*v. Cone*, 535 U.S. 685, 693 (2002). Accordingly, "[t]he focus . . . is on whether the state court's application of clearly established federal law is objectively unreasonable, and . . . an unreasonable application is different from an incorrect one." *Id.* at 694. As a result, to obtain relief under the AEDPA, "a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011); *see also Lockyer v. Andrade*, 538 U.S. 63, 75 (2003) (stating that "[t]he state court's application of clearly established federal law must be objectively unreasonable" for a federal habeas petitioner to prevail and that the state court's "clear error" is insufficient).

When the last state court to decide a federal claim explains its decision in a reasoned opinion, a federal habeas court reviews the specific reasons as stated in the opinion and defers to those reasons if they are reasonable. *Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018). But the habeas court is "not limited by the particular justifications the state court provided for its reasons, and [it] may consider additional rationales that support the state court's determination." *Jennings v. Secretary, Fla. Dep't of Corr.*, 55 F.4th 1277, 1292 (11th Cir. 2022). When the relevant state-court decision is not accompanied with reasons for the decision—such as a summary affirmance without discussion—the federal court "should 'look through' the unexplained decision to the last related state-court decision that

11

does provide a relevant rationale [and] presume that the unexplained decision adopted the same reasoning." *Wilson*, 138 S. Ct. at 1192. The state may "rebut the presumption by showing that the unexplained affirmance relied or most likely did rely on different grounds than the lower state court's decision . . . ." *Id.*

For purposes of § 2254(d)(2), "it is not enough to show that 'reasonable minds reviewing the record might disagree about the finding in question.'" *Brown v. Davenport*, 142 S. Ct. 1510, 1525 (2022) (quotations omitted). "An unreasonable determination of the facts occurs when the direction of the evidence, viewed cumulatively, was too powerful to conclude anything but the petitioners factual claim." *Teasley v. Warden, Macon State Prison*, 978 F.3d 1349, 1355 (11th Cir. 2020) (internal quotation marks and alterations omitted). A state court's findings of fact are presumed correct, and a petitioner can rebut the presumption of correctness afforded to a state court's factual findings only by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

Even where a petitioner succeeds in rebutting the presumption, he must show that the state court's decision is "based on" the incorrect factual determination. *Pye v. Warden, Ga. Diagnostic Prison*, 50 F.4th 1025, 1035 (11th Cir. 2022). This is because a state court decision may still be reasonable "even if some of the state court's individual factual findings were erroneous—so long as the decision, taken as a whole, doesn't constitute an 'unreasonable determination of the facts' and isn't 'based on' any such determination." *Id.*

(quoting *Hayes v. Sec'y, Fla. Dep't of Corr.*, 10 F.4th 1203, 1224–25 (11th Cir. 2021) (Newsom, J., concurring)).

In addition to satisfying the deferential standard of federal court review of a state court adjudication, a federal habeas petitioner must exhaust his claims by raising them in state court before presenting them in a federal petition. *See* 28 U.S.C. § 2254(b)(1)(A); *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999) ("[T]he state prisoner must give the state courts an opportunity to act on his claims before he presents those claims to a federal court in a habeas petition."). A petitioner satisfies this exhaustion requirement if he fairly presents the claim in each appropriate state court and alerts that court to the federal nature of the claim. *Ward v. Hall*, 592 F.3d 1144, 1156 (11th Cir. 2010).

The doctrine of procedural default provides that "[i]f the petitioner has failed to exhaust state remedies that are no longer available, that failure is a procedural default which will bar federal habeas relief, unless either the cause and prejudice or the fundamental miscarriage of justice exception is established." *Smith v. Jones*, 256 F.3d 1135, 1138 (11th Cir. 2001). A petitioner shows cause for a procedural default when he demonstrates "that some objective factor external to the defense impeded the effort to raise the claim properly in the state court." *Wright v. Hopper*, 169 F.3d 695, 703 (11th Cir. 1999). A petitioner demonstrates prejudice by showing that "there is at least a reasonable probability that the result of the proceeding would have been different" absent the constitutional violation.

13

*Henderson v. Campbell*, 353 F.3d 880, 892 (11th Cir. 2003). "A 'fundamental miscarriage of justice' occurs in an extraordinary case, where a constitutional violation has resulted in the conviction of someone who is actually innocent." *Id.*

## III.   INEFFECTIVE ASSISTANCE OF COUNSEL

Grant brings several claims for ineffective assistance of trial counsel under the Sixth Amendment. Under the well-known, two-part standard articulated in *Strickland v. Washington*, 466 U.S. 668 (1984), to succeed, he must show both deficient performance by his counsel and prejudice resulting from those errors. *Id.* at 687.

The first part "requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* The lynchpin of this analysis is whether counsel's conduct "was reasonable considering all the circumstances." *Id.* at 688. A petitioner establishes deficient performance if "the identified acts or omissions [of counsel] were outside the wide range of professionally competent assistance." *Id.* at 690. A court "must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Id.* "[C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Id.*

The second part requires showing that the deficient performance prejudiced the defense. *Id.* at 687. "An error by counsel, even if professionally unreasonable, does not

14

warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Id.* at 691. To demonstrate prejudice, a petitioner must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

"The question [on federal habeas review of an ineffective assistance claim] 'is not whether a federal court believes the state court's determination' under the *Strickland* standard 'was incorrect but whether that determination was unreasonable—a substantially higher threshold.' " *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009) (quoting *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007)). Consequently, federal petitioners rarely prevail on claims of ineffective assistance of counsel because "[t]he standards created by *Strickland* and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so." *Richter*, 562 U.S. at 105 (quotation and citations omitted).

## IV.   ANALYSIS

### A. Claim Over Which the Court Lacks Jurisdiction

#### 1. Ground Ten (D)

Grant argues that trial counsel was ineffective for not moving for a mistrial on counts 80 through 83 of cruelty to an animal because the dogs that were the subjects of these counts were not kept on chains. This Court lacks jurisdiction to consider a challenge to the

validity of Grant's misdemeanor convictions for cruelty to an animal. Because he received sentences of time served, he was not "in custody" on these convictions at the time he filed his § 2254 petition. A district court "shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). If a petitioner's sentence expires before he challenges his judgment under § 2254, he cannot meet the "in custody" requirement. *See Maleng v. Cook*, 490 U.S. 488, 492 (1989). The "in custody" requirement of § 2254(a) is jurisdictional. *See Diaz v. Fla. Fourth Judicial Circuit*, 683 F.3d 1261, 1263 (11th Cir. 2012). Therefore, this Court lacks jurisdiction to consider a challenge to the validity of Grant's convictions for cruelty to an animal raised in Ground Ten (D).

### B. Procedurally Barred Claims

#### 1. Ground One

Grant contends that the trial court erred in denying his motion to suppress evidence. Grant moved to suppress "all the evidence obtained before and after the search warrant in this matter." (Doc. 9-2, Ex. 1, pp. 78-80.) Grant asserted that evidence "was obtained only as a result of an illegal search without a warrant" and "as a result of an illegal investigatory detention." (*Id.*, p. 78.) He alleged violations of his Fourth and Fourteenth Amendment rights. (*Id.*)

Grant's claim is barred from federal habeas review. "[W]here the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial." *Stone v. Powell*, 428 U.S. 465, 494 (1976) (footnotes omitted). "[I]f state procedures afford the defendant in a criminal case the opportunity to litigate whether evidence obtained in violation of the fourth amendment should be excluded, and if that opportunity to litigate fourth amendment issues is 'full and fair' . . . then *Stone v. Powell* precludes federal habeas corpus consideration of those issues whether or not the defendant avails himself of that opportunity." *Caver v. Alabama*, 577 F.2d 1188, 1193 (5th Cir. 1978).

"[F]ull and fair consideration requires consideration by the fact-finding court, and at least the availability of meaningful appellate review by higher state court." *Mincey v. Head*, 206 F.3d 1106, 1126 (11th Cir. 2000) (quoting *Tukes v. Dugger*, 911 F.2d 508, 513-14 (11th Cir. 1990)). But if the state court fails to make "essential findings of fact," then the defendant has not been afforded a "full and fair opportunity to litigate the validity of a search under the Fourth Amendment" and the federal courts cannot apply the *Stone* preclusion. *See Hearn v. Florida*, 326 F. App'x 519, 522 (11th Cir. 2009) (citing *Tukes*, 911 F.2d at 513-14).

In its order denying Grant's motion to suppress, the state court made findings of fact essential to the Fourth Amendment issue. (Doc. 9-2, Ex. 1, pp. 226-30.) It applied the law to these factual findings and determined that, under the totality of the circumstances, there was no illegal search or seizure. (*Id.*) Accordingly, the *Stone* preclusion applies and Ground One is barred from federal habeas review.

### 2. Ground Five

Grant argues that the trial judge should have recused himself from Grant's case. He states that the trial judge was the felony director in the Office of the State Attorney in 2006, when Grant was charged in an earlier case that apparently led to the permanent injunction barring him from having animals. Grant argues that the trial judge was prejudiced and biased against him, thereby violating his right to due process and a fair trial.

Grant's claim is not cognizable on federal habeas review because it does not raise a federal constitutional challenge to the validity of his sentence. *See Branan v. Booth*, 861 F.2d 1507 (11th Cir. 1988). In his petition, Grant does not allege that the trial judge's failure to recuse himself resulted in a federal violation. It is not until the reply that Grant mentions the Fourteenth Amendment. But Grant cannot use his reply to bring a new and distinct claim for relief based on federal law. *See Herring v. Sec'y, Dep't of Corr.*, 397 F.3d 1338, 1342 (11th Cir. 2005) ("[A]rguments raised for the first time in a reply brief are not properly before a reviewing court.").

18

Alternatively, even assuming that Grant has successfully alleged a federal claim in the § 2254 proceedings and the claim is not barred, Grant's claim affords no relief. Grant raised the recusal issue in his second postconviction motion, alleging newly discovered evidence of the trial judge's former employment at the Office of the State Attorney. (Doc. 9-11, Ex. 34, pp. 14-22.) Grant argued that the trial judge violated his Fourteenth Amendment rights by not recusing himself. (*Id.*, p. 19.)

The state court denied Grant's federal claim, finding that his allegations did not "meet the newly discovered evidence standard." (*Id.*, p. 78.) Specifically, the state court found that Grant did not meet the newly discovered evidence standard under Florida law. (*Id.*) This standard provides that in order to be considered newly discovered, the evidence "must have been unknown by the trial court, by the party, or by counsel at the time of trial, and it must appear that defendant or his counsel could not have known [of it] by the use of diligence." *Robinson v. State*, 865 So.2d 1259, 1262 (Fla. 2004) (quoting *Jones v. State*, 709 So.2d 512, 521 (Fla. 1998)). Because the federal claim was rejected for failure to meet the state law standard, it was resolved through the application of an independent and adequate state procedural basis.

Ordinarily, when a state court disposes of a federal claim on an independent and adequate state procedural rule, the claim is procedurally defaulted on federal habeas review. *See Coleman v. Thompson*, 501 U.S. 722, 729 (1991) ("This Court will not review a

19

question of federal law decided by a state court if the decision . . . rests on a state law ground that is independent of the federal question and adequate to support the judgment."). A state court's rejection of a petitioner's federal constitutional claim on state procedural grounds precludes federal review if the state procedural ruling rests on an "independent and adequate" state law ground. *Ferguson v. Sec'y, Dep't of Corr.*, 580 F.3d 1183, 1212 (11th Cir. 2009); *see also Kimbrough v. Sec'y, Fla. Dep't of Corr.*, 809 F. App'x 684, 691-92 (11th Cir. 2020); *Judd v. Haley*, 250 F.3d 1308, 1313 (11th Cir. 2001).

A state court's procedural ruling constitutes an independent and adequate state rule of decision if (1) the last state court rendering a judgment in the case clearly and expressly states that it is relying on a state procedural rule to resolve the federal claim without reaching the merits of the claim, (2) the state court's decision rests solidly on state law grounds and is not intertwined with an interpretation of federal law, and (3) the state procedural rule is not applied in an "arbitrary or unprecedented fashion" or in a "manifestly unfair manner." *Judd*, 250 F.3d at 1313 (citing *Card v. Dugger*, 911 F.2d 1494 (11th Cir. 1990)). A rule must be firmly established and regularly followed by state courts to be considered adequate to foreclose review of a federal claim. *Lee v. Kemna*, 534 U.S. 362, 376 (2002).

The newly discovered evidence standard is well-established in Florida law, and Grant does not establish that the state court applied this standard to him in an arbitrary or

manifestly unfair manner. As the state court's decision was based on an independent and adequate state law rule to support the decision and was not intertwined with the merits of the federal constitutional question, Grant's federal claim is procedurally defaulted on federal habeas review. Because Grant does not establish that either the cause and prejudice or fundamental miscarriage of justice exception applies to overcome the default, the claim is barred from review. *See Harris v. Reed*, 489 U.S. 255, 262 (1989).

Notwithstanding the default, Grant is not entitled to relief. In his postconviction motion, he stated that the trial judge, as a supervisor, would have had decision-making authority over his 2006 case. But Grant has presented no evidence that the trial judge was actually involved in his 2006 case or that the trial judge was otherwise biased. Thus, he cannot show that the trial judge violated his federal rights by failing to recuse himself in the later case. *See Davis v. Jones*, 506 F.3d 1325, 1333 (11th Cir. 2007) (stating that without a showing of actual bias, a claim that only alleged the appearance of impropriety did not entitle the federal habeas petitioner to relief and noting that the Eleventh Circuit has rejected the claim that an appearance of bias violates due process). Grant is not entitled to relief on Ground Five.

### 3. Grounds Six, Seven, And Nine

In Grounds Six, Seven, and Nine, Grant argues that the state courts failed to follow controlling authority. In Ground Six, Grant argues that the trial court "failed to apply

protection and follow decisions handed down by higher court in same jurisdiction identical cases." (Doc. 1, p. 13.) In Ground Seven, Grant argues that the state courts erred in denying his motion to suppress and dismissing his habeas petition because the courts "failed and refuse[d] to follow binding controlling case precedent from higher courts." (*Id.* p. 15.) In Ground Nine, Grant contends that the state appellate court failed to follow "its own binding precedent case law" in case number 2D15-5370, his direct appeal. (*Id.*, pp/.16-17.) These claims are not cognizable on federal habeas review because they raise no federal constitutional challenge to the validity of Grant's sentence. *See Branan*, 861 F.2d 1507.

Alternatively, to the extent that Grant alleges that the state courts failed to follow federal law or violated his federal rights by not following binding precedent, and this argument raises a cognizable federal challenge to the conviction, his claims do not warrant federal habeas relief. It is not apparent that Grant exhausted these claims. Even if they are considered exhausted through his arguments and appeals in state court, any federal claims are vague and conclusory. Grant's generalized assertions that the state courts erred do not articulate specific challenges to any to state court rulings sufficient to identify the legal and factual bases for a claim for relief. Thus, Grant's arguments do not provide a basis for this Court to determine that any state court ruling was contrary to or involved an unreasonable application of clearly established federal law. *See, e.g., Wood v. Bartholomew*, 516 U.S. 1, 8 (1995) (stating that a federal court should not "grant[] habeas relief on the basis of little

22

more than speculation with slight support"). Grounds Six, Seven, and Nine do no warrant federal habeas relief.[4]

### 4. Ground Eight

Grant asserts that he is "actually and legally innocent of committing a crime on October 22, 2014," the day the dogs were removed, because no evidence established "real dog fighting action." (Doc. 1, p. 15.) He also contends that the state trial court lacked jurisdiction due to "the illegal entry and seizure, violations of judge's actions code of judicial conduct, affidavit failed to ensure probable cause existed, fraud charges and the deputies were not in a lawful execution of a legal duty." (*Id.*)

Grant's claim of actual innocence is not cognizable on federal habeas review. *See Herrera v. Collins*, 506 U.S. 390, 400 (1993) ("Claims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding."); *Collins v. Sec'y, Dep't of Corr.*, 809 F. App'x 694, 695 (11th Cir. 2020) (stating that a freestanding actual innocence is not cognizable in a § 2254 proceeding); *Cunningham v. Dist. Attorney's Off. for Escambia Cnty.*, 592 F.3d 1237, 1272 (11th Cir. 2010) ("[T]his Court's own precedent does not allow habeas relief on a freestanding

---

[4] In his reply, Grant appears to assert that these state court decisions involved the Fourth Amendment issues addressed in Ground One. As addressed, the Fourth Amendment claims are barred from federal habeas review under *Stone*.

innocence claim in non-capital cases." (citing *Jordan v. Sec'y, Dep't of Corr.*, 485 F.3d 1351, 1356 (11th Cir. 2007))).

Nor does Grant show entitlement to relief based on the state trial court's alleged lack of jurisdiction. This claim is not cognizable because it does not raise a federal issue. *See Branan*, 861 F.2d 1507. Grant only presents a federal claim in his reply but he cannot use the reply to raise a federal claim for the first time. *See Herring*, 397 F.3d at 1342. But even assuming Grant properly raised a federal claim, the claim is procedurally defaulted because Grant did not raise it on direct appeal or in his postconviction motion. (Doc. 9-4, Ex. 2; Doc. 9-7, Ex. 19, pp. 14-60.) Notwithstanding the default, Grant fails to show that the state trial court lacked jurisdiction on the bases alleged. In Florida courts, "jurisdiction in criminal cases is determined by the charge made in the indictment or information." *State v. Vazquez*, 450 So.2d 203, 204 (Fla. 1984). Grant was charged with felonies and misdemeanors related to the dogs and items recovered from Grant's properties. Florida's circuit courts have jurisdiction over all felonies and misdemeanors that arise from the same circumstances as charged felonies. *See* Art. V, § 20(c)(3), Fla. Const. (stating that circuit courts have "exclusive original jurisdiction . . . [o]f all felonies and of all misdemeanors arising out of the same circumstances as a felony which is also charged . . . ."); § 26.012(2)(d), Fla. Stat. (same). Ground Eight warrants no relief.

C. Merits Review

24

### 1. Ground Two: Introduction

Within Ground Two, Grant alleges ineffective assistance of trial counsel regarding prospective witnesses for both the suppression hearing and trial. First, he alleges counsel should have located, interviewed, and called witnesses who were at the Fort Meade property during the officers' investigation. Second, he alleges counsel should have called a veterinarian as an expert and introduced the veterinarian's invoice. Third, he claims counsel should have deposed and called law enforcement officers.

### 2. Ground Two (A): Fort Meade Witnesses

#### a. Evidentiary Hearing on Grant's Motion to Suppress and State Trial Court's Ruling

As some of Grant's claims involve trial counsel's failure to call witnesses at the suppression hearing, a discussion of the hearing is necessary.[5] Animal Control employee Craig Burke explained that on or around October 22, 2014, Marsha Brooks, an assistant from an animal hospital, called to ask about filling out rabies vaccine certificates for dogs at Grant's property in Fort Meade. (Doc. 9-2, Ex. 1, pp. 87-88.) Knowing of an investigation into Grant, Burke alerted authorities. (*Id.*, pp. 88-89.)

---

[5] Grant may proceed with claims alleging trial counsel was ineffective at the suppression hearing, even though his underlying Fourth Amendment claim is barred from federal habeas review. *See Kimmelman v. Morrison*, 477 U.S. 365, 382-83 (1986) ("We reject petitioners' argument that *Stone*'s restriction on federal habeas review of Fourth Amendment claims should be extended to Sixth Amendment ineffective-assistance-of-counsel claims which are founded primarily on incompetent representation with respect to a Fourth Amendment issue.").

Sergeant Thomas Dixon and Deputy Rick Anderson arrived and walked to the back of the property where veterinarian Dr. Tim Brooks's truck was parked. (*Id.*, p. 94, 122-23.) The gates to the property were open but the officers walked past "no trespassing" signs. (*Id.*, pp. 107, 109, 123.) Sergeant Dixon asked Grant if Grant could come out front to talk to Detective Scarborough about the posting for the animals on the property. (*Id.*, p. 97.) Sergeant Dixon and Deputy Anderson denied yelling at Grant or that Grant told them to leave. (*Id.*, pp. 97-98, 100, 125-26.)

Sergeant Dixon testified that Grant voluntarily walked to the front and that Grant was still free to leave at that time. (*Id.*, pp. 99, 113-14.) Deputy Anderson similarly testified that officers did not force Grant to walk to the front to talk to Detective Scarborough. (*Id.*, pp. 125-26.) But Deputy Anderson testified to his understanding that Grant was not free to leave when he walked around the property to go to talk to Detective Scarborough. (*Id.*, p. 134.)

Detective Scarborough testified that Grant walked up to Detective Scarborough's truck at the front of the property. (*Id.*, p. 148.) Detective Scarborough read the consent to search form to Grant, and Grant agreed to sign the form. (*Id.*, p. 149.) Detective Scarborough testified that no one else was around or within earshot of the conversation and no other officers were present when Grant signed the form. (*Id.*, pp. 151-53.) Deputy Anderson stated that he did not hear Grant and Detective Scarborough's discussion. (*Id.*,

26

p. 136.) Sergeant Dixon testified that after Grant signed the consent to search form, he called in other units. (*Id.*, p. 105.)

Dr. Tim Brooks testified at the suppression hearing. He testified that he looked at the dogs, and that two deputies arrived. (*Id.*, p. 172.) Dr. Brooks recalled that at one point, Grant and one deputy walked away toward the front of the property. (*Id.*, p. 173.) Dr. Brooks did not hear deputies threaten Grant. (*Id.*, p. 175.) Dr. Brooks administered vaccines to six dogs before Grant came back and told him to stop because officers were taking his dogs. (*Id.*) After Grant paid him, Dr. Brooks left. (*Id.*) When he left, he observed a lot of officers in the street. (*Id.*, p. 180.)

Grant testified that he closed the gate after Dr. Brooks arrived and that officers opened the gate to get into the back of the property. (*Id.*, pp. 189-90.) He testified that he told Sergeant Dixon and Deputy Anderson to leave and they refused. (*Id.*, p. 192.) Grant stated that Sergeant Dixon and Deputy Anderson escorted him out to see Detective Scarborough, and told him he was not free to leave. (*Id.*, p. 194.) Grant stated that Sergeant Dixon cursed at and threatened him. (*Id.*, p. 201.) Grant testified that Detective Scarborough told him they were going to take the dogs, and that there was another deputy present. (*Id.*, p. 195.) Grant testified that he said he did not want officers to look inside the bar and that when he signed the consent to search form, he thought it was a form

27

releasing custody of the dogs. (*Id.*, pp. 197-99.) Grant testified that about six officers were present at the property when he signed the consent form. (*Id.*, p. 204.)

The state court found that the initial entry into the back of Grant's property was illegal. (Doc. 9-2, Ex. 1, p. 228.) But the state court found that, under the totality of the circumstances, Grant knowingly and voluntarily consented to a search of his property, and that there was no illegal search or seizure. (*Id.*, pp. 229-30.)

### b. Marsha Brooks

In his postconviction motion, Grant argued that counsel should have called Marsha Brooks because she would have testified that Grant was not committing a crime, that when deputies arrived Grant was obtaining vaccinations for his dogs and no dogfighting was taking place, that Deputy Anderson walked Grant off the property while Sergeant Dixon remained on the property "searching and asking questions," and that all dogs examined by Marsha Brooks and Dr. Tim Brooks were healthy enough to receive rabies vaccines. (Doc. 9-7, Ex. 19, pp. 17-18.) Grant claimed that Marsha Brooks's testimony would have contradicted the testimony of Detective Scarborough and Dr. DeGroat, the Animal Control staff veterinarian who examined the dogs. (*Id.*, p. 18.) He also stated that the invoice from the veterinary services does not "talk of dog fighting, dogs on logging chains, injuries or scars on dogs." (*Id.*)

28

Grant does not clarify whether counsel should have called Marsha Brooks at the suppression hearing or at trial. The postconviction court's order labeled Grant's claim as involving witnesses at the suppression hearing. (Doc. 9-8, Ex. 19, pp. 114-15.) But the state court's analysis reflects that it construed the claim as alleging that Grant wanted Marsha Brooks called at both the suppression hearing and at trial. Indeed, Grant refers to contradicting Dr. DeGroat's testimony, which was presented at trial.

The state court denied Grant's claim. Concerning the suppression hearing, the state court noted that other testimony showed that Sergeant Dixon walked with Grant from the backyard to talk with Detective Scarborough but did not physically escort him, and that three officers were initially present. (*Id.*, p. 115) The court found that Grant failed to show deficient performance or prejudice. (*Id.*, p. 116.)

Grant does not show entitlement to relief. While Grant claims that Marsha Brooks would have testified that Sergeant Dixon remained in the back of the property searching and asking questions when Grant went to the front of the property, Grant does not make specific factual allegations about what Sergeant Dixon did. Nor does he show that such testimony would have resulted in a different outcome at the suppression hearing considering the state court's ruling that despite the initial illegal entry, Grant consented to a search of the property and there was no illegal search or seizure. Further, Grant has not provided evidence of what testimony Marsha Brooks would have given. *See Shaw v. United*

*States*, 729 F. App'x 757, 759 (11th Cir. 2018) ("[The Eleventh Circuit has] stated that complaints about uncalled witnesses are not favored, because the presentation of testimony involves trial strategy and 'allegations of what a witness would have testified are largely speculative.' " (quoting *Buckelew v. United States*, 575 F.2d 515, 521 (5th Cir. 1978))); *Streeter v. United States*, 335 F. App'x 859, 864 (11th Cir. 2009) ("In a habeas petition alleging ineffective assistance of counsel, mere speculation that missing witnesses would have been helpful is insufficient to meet the petitioner's burden of proof." (citing *Johnson v. Alabama*, 256 F.3d 1156, 1187 (11th Cir. 2001))).

Regarding the trial, the state court rejected Grant's claim about the effect of Brooks's prospective testimony that the dogs were well enough to receive rabies vaccinations and that Brooks's invoice did not note injuries. The court cited Dr. DeGroat's testimony that a veterinarian would administer rabies vaccines if the dogs did not have a fever and Dr. DeGroat's detailed testimony about the dogs' injuries. (Doc. 9-8, Ex. 19, p. 115.) The court found that Grant failed to show deficient performance or prejudice for not calling Marsha Brooks.

The state court's ruling was reasonable. As the state court noted, Dr. DeGroat explained that rabies vaccines would always be administered if a dog was free of fever because of the unique and serious risks rabies poses to humans. (Doc. 9-3, Ex. 1d, pp. 546-47.) In her comprehensive testimony, Dr. DeGroat also addressed each dog recovered from

Grant's properties and discussed their conditions. (*Id.*, pp. 512-622.) Grant fails to show a reasonable probability of a different outcome had Marsha Brooks testified that the dogs could receive the vaccines or had the invoice been admitted. In addition, this claim is too speculative to warrant federal habeas relief because, again, Grant does not provide evidence about what Brooks would have said had she testified. *See Shaw*, 729 F. App'x at 759; *Streeter*, 335 F. App'x at 864.

Grant does not show that the state court unreasonably applied *Strickland* or unreasonably determined the facts in denying his claim that counsel was ineffective regarding prospective witness Marsha Brooks.

### c. Ron Davis

In his postconviction motion, Grant stated that his friend Ron Davis came to the Fort Meade property shortly after police arrived. Grant asserted that Davis likely would have testified to how many officers were present, that Sergeant Dixon threatened Davis by saying that if Davis did not hand over Grant's money and keys, Sergeant Dixon would take Davis to jail, and that Sergeant Dixon and Deputy Anderson confiscated Grant's phone while Grant was trying to contact his attorney. He claims that Davis's testimony would have supported Deputy Anderson's testimony that Grant was not free to leave after the "initial illegal entry." (Doc. 9-7, Ex. 19, p. 18.)

31

The state court denied this claim. The state court noted that it was undisputed that many officers were on scene; that Grant did not allege when his property was taken; and that the actions Davis allegedly would have testified to would not have established an illegal seizure. (Doc. 9-8, Ex. 19, p. 115.) Therefore, the state court found that Grant failed to establish deficient performance of counsel or prejudice. (*Id.*, p. 116.)

Grant has not shown that the state court's ruling was unreasonable. As the state court noted, it was clear that numerous officers were present. Further, Grant does not show that additional testimony about whether he was free to leave when he went to talk to Detective Scarborough would have made a difference in the outcome. Nor does Grant establish, based on the vague and conclusory nature of his assertion that police took his personal items, that the state court unreasonably concluded that he failed to show such actions amounted to a constitutional violation or how such information would have changed the outcome of the suppression hearing. Moreover, because Grant provides no evidence of what Davis would have testified to, he cannot establish entitlement to federal habeas relief. *See Shaw*, 729 F. App'x at 759; *Streeter*, 335 F. App'x at 864. Grant does not show that the state court unreasonably applied *Strickland* or unreasonably determined the facts in denying his claim that trial counsel was ineffective for not calling Ron Davis at the suppression hearing.

### d. Joyice Smith

In his postconviction motion, Davis contends that Joyice Smith could have testified to "what she saw and heard [Deputy] Anderson and [Detective] Scarborough doing and saying, misleading or deceiving Defendant into signing a consent form after an illegal entry." (Doc. 9-7, Ex. 19, p. 18.) Davis asserts that Smith would have testified that Grant believed he was signing a release form from an animal control supervisor.

The state court denied Grant's claim. The state court cited Detective Scarborough's testimony that no one else was present when he was talking to Grant and that he read the consent form to Grant. The state court found that Grant has "failed to state how the officers misled or deceived him into signing the consent to search form." (Doc. 9-8, Ex. 19, p. 116.) The state court also found that Smith's testimony about what Grant thought he was signing would not have been admissible at a trial. (*Id.*, pp. 115-16.) The state court found that Grant failed to show deficient performance or prejudice. (*Id.*, p. 16.)

Grant does not show that the state court's ruling was unreasonable. Regarding the suppression hearing, neither Detective Scarborough nor Grant testified that Smith was present as Grant signed the form. (Doc. 9-2, Ex. 1, pp. 151, 197-98, 204.) As the state court pointed out, Grant does not explain how the officers misled him, or what words or actions Smith observed that support this conclusion. And he does not offer evidence establishing what Smith's testimony would have been. *See Shaw*, 729 F. App'x at 759; *Streeter*, 335 F. App'x at 864. To the extent that his claim involves calling Smith at trial,

this Court must defer to the state court's determination that the proposed testimony would have been inadmissible as a matter of Florida evidentiary law. *See Pinkney v. Secretary, DOC*, 876 F.3d 1290, 1295 (11th Cir. 2017) ("[A]lthough 'the issue of ineffective assistance—even when based on the failure of counsel to raise a state law claim—is one of constitutional dimension,' [a federal court] 'must defer to the state's construction of its own law' when the validity of the claim that . . . counsel failed to raise turns on state law." (quoting *Alvord v. Wainwright*, 725 F.2d 1282, 1291 (11th Cir. 1984))). Grant does not show that the state court unreasonably applied *Strickland* or unreasonably determined the facts in denying his claim.

### 3. Ground Two (B): Failure to Call Dr. Tim Brooks

Grant argues that trial counsel should have called Dr. Brooks at trial. Alternatively, Grant contends, trial counsel should have introduced Dr. Brooks's testimony from the suppression hearing. Grant contends that Dr. Brooks would have testified about both the police entry into the property and the dogs' condition. He also contends that counsel should have introduced Dr. Brooks's invoice for the vaccines because the invoice mentioned no injuries to the dogs.

Concerning Dr. Brooks's potential testimony about the police, the state court determined that testimony from Dr. Brooks about the number of officers and their entry onto Grant's property would not have likely changed the outcome of trial. (Doc. 9-8, Ex.

19, p. 116.) The state court also noted that while Grant contended Dr. Brooks could have testified that there were no signs the dogs had been abused or neglected, Dr. Brooks only examined a small number of the dogs and determined they were healthy enough for vaccinations. (*Id.*) The court found that Grant's claim was conclusory and without merit in the light of Dr. DeGroat's "extensive testimony" about the dogs' conditions. (*Id.*) Accordingly, the state court determined that Grant failed to establish either deficient performance or resulting prejudice. (*Id.*)

Grant does not show that the state court's determination was unreasonable. First, the state court did not unreasonably find that Grant failed to establish that Dr. Brooks's testimony about the police entry likely would have changed the outcome at trial. He fails to show how this information was relevant to establishing the charges or to Grant's defense that the dogs were used for hunting.

Regarding the dogs' condition, as the state court noted, Dr. Brooks's suppression hearing testimony indicates that he examined only 18 of the dogs and determined that they were healthy enough to receive rabies vaccines. (Doc. 9-2, Ex. 1, pp. 172-73.) But Dr. DeGroat gave testimony about each dog at trial based on her examinations of the dogs after they were removed and discussed the concerns she observed. (Doc. 9-3, Ex. 1d, pp. 512-622.) As addressed, she stated that rabies vaccines would be administered unless a dog had a fever. (*Id.*, pp. 546-47.) Additionally, the jury saw photographs of the dogs during

35

Dr. DeGroat's testimony. Thus, the jurors viewed the dogs' conditions alongside Dr. DeGroat's testimony about her observations and medical conclusions. Considering that testimony, the state court did not unreasonably conclude that Dr. Brooks's potential testimony about the dogs he examined, or the invoice for his veterinary services, would have created a reasonable probability of a different outcome. The state court did not unreasonably apply *Strickland* or unreasonably determine the facts in denying Grant's claim about Dr. Brooks.

### 4. Grounds Two (C) and (D): Introduction

Grant argues that counsel was ineffective for failing to "investigate, locate, interview or depose" all deputies "on scene" to determine "who wrote any records, forensic reports or inventory list after the illegal entry." (Doc. 1, p. 9.) Grant states that evidence was unphotographed, untested, "uncorroborated by any other deputies and was not preserved." (*Id.*) He asserts that counsel was ineffective regarding two groups of officers.

### a. Ground Two (C): First Group of Officers

In his postconviction motion, Grant alleged that counsel should have called Deputies Tanner, Cogswell, McKee, Burdette, Blackburn, Smith, Dixon, Anderson, and Seller. He claimed that these were "all deputies . . . involved in the illegal entry and misconduct." (Doc. 9-7, Ex. 19, p. 23.) He appears to argue that counsel should have called

these deputies at the suppression hearing, *see Kimmelman*, 477 U.S. at 382-83, and that counsel should have called some deputies at trial.

### b. All Officers

Grant argued that all officers helped detain him, would have testified that it took hours to obtain warrants, and (aside from Deputy Anderson) could have corroborated Deputy Anderson's testimony that Grant was not free to leave. In denying this claim, the state court noted that it had found Grant was not illegally detained, despite his suppression hearing testimony that he did not feel free to leave. (Doc. 9-8, Ex. 19, p. 116.) The state court also found that Grant failed to indicate with specificity what he believed the deputies would say about his detention. (*Id.*)

Grant does not show entitlement to relief. He does not support his claim with evidence of what the officers would have said. *See Shaw*, 729 F. App'x at 759; *Streeter*, 335 F. App'x at 864. His claim is therefore too speculative to warrant federal habeas relief on this ineffective assistance claim. *See, e.g., Tejada v. Dugger*, 941 F.2d 1551, 1559 (11th Cir. 1991) (stating that a petitioner's "unsupported allegations" that are "conclusory in nature and lacking factual substantiation" cannot sustain an ineffective assistance claim). As Grant does not show that the state court unreasonably applied *Strickland* or unreasonably determined the facts in denying his claim, he is not entitled to relief.

### c. Deputy Tanner

Grant argues that Deputy Tanner collected the carpet and wood panels, and could have testified to whether officers photographed these items and why they were destroyed. Grant also states that Deputy Tanner "came onto the property to bring [Grant] off his property" after he paid Dr. Brooks. (Doc. 9-7, Ex. 19, p. 24.) The state court denied the claim, noting that Detective Scarborough's testimony accounted for the destruction of this evidence. (Doc. 9-8, Ex. 19, p. 116.) Grant does not show that this ruling was unreasonable. Again, Grant does not prove what Deputy Tanner's testimony would have been, and the destruction of evidence was addressed at trial. (Doc. 9-3, Ex. 1c, p. 473); *see Shaw*, 729 F. App'x at 759; *Streeter*, 335 F. App'x at 864. Grant does not show that the state court's ruling involved an unreasonable application of *Strickland* or was based on an unreasonable factual determination. He is not entitled to relief.

### d. Deputy Blackburn

Grant argues that Deputy Blackburn likely would have testified, apparently at the suppression hearing, that she saw Grant give his keys and money to his girlfriend Nickie Sanders, and that Sergeant Dixon told Deputy Anderson to find Sanders and retrieve Grant's keys and money. Grant argues that this information would show he was not free to leave after the initial entry. The state court denied this claim, noting that Grant did not establish when this occurred and that "at some point" he was not free to leave. (Doc. 9-8, Ex. 19, pp. 116-17.) Grant fails to show that the state court unreasonably denied his claim.

He does not provide evidence establishing what Deputy Blackburn would have testified to. *See Shaw*, 729 F. App'x at 759; *Streeter*, 335 F. App'x at 864. Nor does he show how such testimony likely would have changed the outcome of the suppression hearing. Grant does not show that the state court unreasonably applied *Strickland* or that its ruling was based on an unreasonable factual determination. He is not entitled to relief.

### e. Deputy Seller

Grant argues that Deputy Seller would have stated that he listened to Grant talk to Detective Scarborough about signing over the dogs. The state court found that Grant did not establish why it was necessary to depose Deputy Seller about this discussion. (Doc. 9-8, Ex. 19, p. 116.) Grant does not show that the state court's ruling was unreasonable. Because Grant does not establish what Deputy Seller would have stated about the conversation, he does not establish that Deputy Seller's potential testimony about the conversation would have aided the defense. *See Shaw*, 729 F. App'x at 759; *Streeter*, 335 F. App'x at 864. The state court's ruling did not involve an unreasonable application of *Strickland*. Nor was it based on an unreasonable factual determination. Grant is not entitled to relief.

### f. Ground Two (D): Second Group of Officers

Grant also alleged that counsel should have investigated a second group of officers, Deputies Eldridge, Losciale, Beote, Lopes, Rhoden, Kistler, and Smith. He contends that

39

they were present at his properties "as custodians and crime forensic techs." (Doc. 9-7, Ex. 19, p. 24.)

### g. All Officers

Grant argues these officers could have testified about the alleged blood and whether it was "blood or paint or what kind of blood." (*Id.*) The state court denied this claim, finding that it was "unreasonable to think" the officers could identify the type of blood, and noted that the jury saw pictures of the spots and that Detective Scarborough testified that the spots looked like blood. (Doc. 9-8, Ex. 19, p. 117.) This was not an unreasonable denial of Grant's claim. Grant does not establish that any of the officers could have testified to this matter. *See Shaw*, 729 F. App'x at 759; *Streeter*, 335 F. App'x at 864. Indeed, Grant called Deputy Losciale, but there is no indication from her trial testimony that she had information about the origin of the apparent blood spots. (Doc. 9-3, Ex. 1d, pp. 685-94.) Grant does not show that the state court unreasonably applied *Strickland* or unreasonably determined the facts. He is not entitled to relief.

### h. Deputies Eldridge, Beote, and Lopes

Grant argues that Deputies Eldridge, Beote, and Lopes could have testified to the dog food on the property, the frozen raw meat, and the existence of a cutting area for preparing meat from hunting. The state court did not expressly address this portion of the

claim, but this Court presumes that the claim was denied.[6] Grant fails to show that trial counsel was ineffective for not calling these officers. He does not establish, with specificity, what they would have testified to about these matters. Detective Scarborough testified that he found high-quality dog food. (Doc. 9-3, Ex. 1c, p. 437.) And Grant testified to the freezers with raw meat and the cutting area. (Doc. 9-3, Ex. 1e, pp. 776-80.) Even assuming these officers could have testified about the meat and cutting area, and Grant believes that testimony would have supported his explanation for how apparent blood spots were deposited, he does not show entitlement to relief. He does not demonstrate, as he must to meet *Strickland*'s prejudice prong, a reasonable probability of a different outcome at trial considering the overall significant evidence that he had the dogs for the purpose of dogfighting. The state court's decision was not contrary to and did not involve an unreasonable application of clearly established federal law. Grant is not entitled to relief.

### i. Deputy Kistler

---

[6] Ordinarily, when a state court addresses some claims raised by a defendant, but not a claim that is later raised in a federal habeas proceeding, the federal habeas court presumes that the state court denied the claim on the merits. *See Johnson v. Williams*, 568 U.S. 289 (2013). This presumption is rebuttable though, and de novo review of such a claim is appropriate when "the evidence leads very clearly to the conclusion that a federal claim was inadvertently overlooked in state court[.]" *Id.* at 303. Even if the state court did not rule on the merits on this part of Grant's claim, he fails to show entitlement to federal habeas relief under de novo review for the same reasons addressed in this order. *See, e.g.*, *Richter*, 562 U.S. at 105 ("Even under de novo review, the standard for judging counsel's representation is a most deferential one. Unlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge.").

Grant asserted that Deputy Kistler collected three blood samples and likely could have testified to why this evidence was not tested, photographed, and preserved. He also claimed that Deputy Kistler could have testified about the fence in Fort Meade and why she did not photograph damage to the gate where Grant alleges Dixon entered the property. (Doc. 9-7, Ex. 19, pp. 24–25.)

Regarding Grant's claim that Deputy Kistler would have testified about untested and unpreserved evidence, the state court noted that the spots were photographed and the photographs were presented at trial, and that the State does not have to submit evidence for testing. (Doc. 9-8, Ex. 19, p. 117.) Regarding his claim that Sergeant Dixon broke through the fence to gain entry and damaged it, the state court noted that at the suppression hearing the Court determined that the gate was left open. (*Id.*) The state court found that Grant failed to establish deficient performance or resulting prejudice. (*Id.*)

Grant does not show that the state court unreasonably denied his claim. His claim is too speculative to warrant relief, as he does not establish what Deputy Kistler would have testified. *See Shaw*, 729 F. App'x at 759; *Streeter*, 335 F. App'x at 864. Further, the apparent blood spots were photographed, and the jury saw the photographs. (Doc. 9-3, Ex. 1c, pp. 414, 440.) And Grant does not show that Deputy Kistler had personal knowledge about the source of any damage to the fence in Fort Meade. Thus, he does not show a reasonable probability of a different outcome even if she testified about the fence or why

42

she did not photograph it. Grant does not demonstrate that the state court's order involved an unreasonable application of *Strickland* or was based on an unreasonable factual determination. He is not entitled to relief.

### j. Deputy Smith

Grant asserts that Deputy Smith could have testified about the dogs' conditions and the chains and collars, as well as what happened to the carpet in Bartow. Grant also alleged in his postconviction motion that Deputy Smith could have testified about which officers were present at Bartow and whether she had a warrant to keep Defendant's teenaged daughter outside the house on the property until an adult arrived.

The state court concluded that Grant did not establish what Deputy Smith would have said about the dogs and evidence collected, and that Detective Scarborough's testimony established what happened to the wood panels and carpet. (Doc. 9-8, Ex. 19, p. 117.) The state court also found that whether Grant's daughter was prevented from coming in the house would not have changed the outcome of trial. (*Id.*) The state court found that Grant did not establish deficient performance of trial counsel or prejudice. (*Id.*)

The state court's decision was reasonable. As with other prospective witnesses, Grant has not established what Deputy Smith's testimony would have been. *See Shaw*, 729 F. App'x at 759; *Streeter*, 335 F. App'x at 864. Furthermore, the destruction of some evidence was addressed at trial, and Grant has not established how evidence of which

officers were present and whether his daughter was prevented from entering the house would have changed the outcome of the proceedings.[7] The state court did not unreasonably apply *Strickland* in denying Grant's claim. Nor was its ruling based on an unreasonable factual determination. Grant is not entitled to relief.

### 5. Additional Claim in Ground Two

Grant also argues that counsel failed to depose Scarborough and object to hearsay when he testified about the outline on the floor, red carpet fibers on the floor, and the alleged blood substance. Grant claims that this testimony was not substantiated by photographs or by other officers. The state court noted that this testimony was not hearsay because it was based on observation. (Doc. 9-8, Ex. 19, p. 117.) The state court found that Grant failed to establish deficient performance or prejudice. (*Id.*) Grant fails to show entitlement to relief, as he does not show that Scarborough improperly testified to hearsay. The state court's ruling did not involve an unreasonable application of *Strickland* and was not based on an unreasonable factual determination. He is not entitled to relief.

### 6. Ground Three (A)

Grant contends that his consecutive sentences for crimes that have identical elements and involved "one episode in one day" violate double jeopardy. (Doc. 1, p. 10.)

---

[7] The state court's order referred to the outcome of trial. To the extent Grant's claim involved calling Deputy Smith at the suppression hearing, Grant is not entitled to relief even assuming that the state court overlooked this part of the claim and he is entitled to de novo review.

His postconviction motion referred to his sentences for the counts of animal fighting or baiting, some of which were imposed consecutive to one another. (Doc. 9-3, Ex. 1, pp. 599-601, 631-658.)

The state court rejected Grant's argument, finding no double jeopardy violation because "each count involves a separate dog." (Doc. 9-8, Ex. 19, p. 118.) The Double Jeopardy Clause prohibits multiple punishments for the same offense. *See North Carolina v. Pearce*, 395 U.S. 711, 717 (1969). Grant does not show a violation of his right to be free from multiple punishments for the same offense. Each count of animal fighting or baiting refers to an individual dog as identified by the unique number assigned when the dogs were removed from Grant's properties. (Doc. 9-2, Ex. 1, pp. 269-77.) One count was charged for each of the 69 dogs. Because each count involved a different dog, Grant was not punished multiple times for the same offense. Grant does not show that the state court's decision was contrary to or involved an unreasonable application of clearly established federal law, or was based on an unreasonable factual determination. He is not entitled to relief on Ground Three (A).

### 7. Ground Three (B)

Grant argues that his convictions for felony animal fighting or baiting and for misdemeanor cruelty to an animal for the same dogs violate double jeopardy. He stated in his postconviction motion that "both offenses have knowing element of cruelty to a dog"

and that "the misdemeanor offense[s] are lesser offenses the statutory elements of which are subsumed by the felony offenses are greater offenses." (Doc. 9-7, Ex. 19, p. 40.) The charges of cruelty to an animal were brought for dogs 1, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, and 27. (Doc. 9-2, Ex. 1, pp. 278-79.) Those dogs were also the subject of animal fighting or baiting charges. (*Id.*, pp. 269-72.)[8]

Grant does not show that he was punished multiple times for the same conduct.[9] The Double Jeopardy Clause permits cumulative punishments for a single incidence of criminal behavior when the legislature clearly intends cumulative punishments. *Williams v. Singletary*, 78 F.3d 1510, 1512 (11th Cir. 1996). The constitutional double jeopardy protection "does no more than prevent the sentencing court from prescribing greater punishment than the legislature intended." *Missouri v. Hunter*, 459 U.S. 359, 366 (1983). Absent a clear indication of contrary legislative intent, the "same-elements" test announced in *Blockburger v. United States*, 284 U.S. 299 (1932), determines whether separate statutory provisions authorize cumulative punishment for a single criminal incident. *Williams*, 78 F.3d at 1512-13.

---

[8] This Court considers Grant's claim to the extent it challenges the validity of his felony convictions for animal fighting or baiting. The Court lacks jurisdiction to consider any challenge to the validity of Grant's misdemeanor convictions for cruelty to an animal, since he does not meet the in custody requirement of § 2254 regarding those convictions because he received a sentence of time served for them.

[9] The state court did not expressly address this part of Grant's claim, if the state court overlooked this part of the claim, Grant is not entitled to relief under de novo review.

46

The "same-elements" test examines whether each offense contains an element not contained in the other offense. "[I]f each statutory offense requires proof of an element not contained in the other, the offenses are not the 'same' and double jeopardy is no bar to cumulative punishment." *Id.* at 1513. But "where the two offenses for which the defendant is punished or tried cannot survive the 'same-elements' test, the double jeopardy bar applies." *United States v. Dixon*, 509 U.S. 688, 696 (1993).

The elements of animal fighting or baiting relevant to this case are the "[b]aiting, breeding, training, transporting, selling, owning, possessing, or using any wild or domestic animal for the purpose of animal fighting or baiting." § 828.122(3)(a), Fla. Stat. A person commits misdemeanor cruelty to an animal when the person "unnecessarily overloads, overdrives, torments, deprives of necessary sustenance or shelter, or unnecessarily mutilates, or kills any animal, or causes the same to be done, or carries in or upon any vehicle, or otherwise, any animal in a cruel or inhumane manner." § 828.12(1), Fla. Stat.

Each statute requires engaging in one of a list of qualifying acts. But the lists of qualifying acts are different and the qualifying acts for the offense of animal fighting or baiting must be done with a certain purpose, while cruelty to an animal does not require any particular purpose or intent. Contrary to Grant's assertion, "cruelty" is not an element of animal fighting or baiting. Grant does not show that his convictions violate double jeopardy under *Blockburger*. Because he has not established that the state court's ruling was contrary to or

involved an unreasonable application of clearly established federal law or was based on an unreasonable factual determination, Grant is not entitled to relief on Ground Three(B).

### 8. Ground Four (A)

Grant argues that his conviction was obtained in violation of *Giglio v. United States*, 405 U.S. 150 (1972). Grant contends that the State introduced Detective Scarborough's false testimony about the blood spots, wood panels, and rolls of carpet that he saw at Grant's properties. Grant claims that the testimony was false because the evidence was not tested, photographed, or preserved.

The state court denied Grant's claim. The state court concluded that the fact the wood panels and carpet rolls were destroyed due to their size "does not mean that they never existed" or that "the case gets dismissed as Defendant argues." (Doc. 9-8, Ex. 19, p. 119.) The state court pointed to Detective Scarborough's testimony that he observed the items before obtaining a search warrant and that the items were listed in the search warrant applications. (*Id.*) The state court also noted that although the samples were not sent to the Florida Department of Law Enforcement (FDLE) for testing, photographs of the apparent blood spots were presented to the jury. (*Id.*) The state court concluded that Grant failed to show a *Giglio* violation.

The state court did not unreasonably deny Grant's claim. Under *Giglio*, the prosecution violates a criminal defendant's due process rights by presenting evidence

known to be false. 405 U.S. at 153-54. A petitioner "must establish that (1) the prosecutor knowingly used perjured testimony or failed to correct what he subsequently learned was false testimony; and (2) such use was material—i.e., that there is any reasonable likelihood that the false testimony could have affected the judgment." *Ferguson v. Sec'y, Dep't of Corr.*, 580 F.3d 1183, 1208 (11th Cir. 2009) (quoting *Davis v. Terry*, 465 F.3d 1249, 1253 (11th Cir. 2006)).

Grant does not show that Detective Scarborough testified falsely about the identified items. He asserts that testimony about the wood panels and carpet was false because the testimony was not supported by physical evidence or photographs, and apparently because he testified that these items were used for different purposes. But a lack of physical evidence and conflicting testimony about the use or likely use of these items do not show that Detective Scarborough testified falsely.

Additionally, as the state court noted, the jury saw photographs of the spots. (Doc. 9-3, Ex. 1c, pp. 414, 440.) Grant fails to show that Detective Scarborough testified falsely about the spots when he explained that they appeared to him to be blood, simply because the spots were not tested by FDLE or because Grant testified that any blood came from his preparing meat or moving thawing meat. The state court did not unreasonably apply *Giglio* or unreasonably determine the facts in denying Grant's claim.

### 9. Ground Four (B)

Grant argues that his conviction was obtained in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). Grant argues that the State violated *Brady* by destroying the wood panels and carpet rolls that Scarborough observed at the Bartow property, which the State alleged he used to create a dogfighting ring and by allegedly destroying or failing to preserve blood samples. Detective Scarborough testified at trial that the wood panels and carpet had been disposed of because there was not room to store them.

The state court denied Grant's claim. The state court found that Grant failed to sufficiently allege prejudice because he did not show how the wood panels and carpet would have helped his defense. (Doc. 9-8, Ex. 19, p. 119.) The state court found that based on the evidence at trial, including testimony about the condition of the dogs, the treadmill and sled, the dog fighting book, the markings showing where rings were placed, apparent blood stains, the information about dogs and their fights, and the logging chains, photographs of the carpet and panels likely would not have changed the outcome of trial. (*Id.*) On this basis, the state court denied Grant's *Brady* claim and his claim that his conviction was obtained in bad faith due to the destruction of evidence. (*Id.*)

The state court's decision was reasonable. *Brady* holds that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87. To establish a *Brady* violation, Grant must show

50

that "(1) the evidence at issue is favorable to [him], either because it is exculpatory or because it is impeaching; (2) the evidence was suppressed by the State, either willfully or inadvertently; and (3) [he] incurred prejudice." *Wright v. Sec'y, Fla. Dep't of Corr.*, 761 F.3d 1256, 1278 (11th Cir. 2014). The prejudice prong, "also referred to as the 'materiality prong,' is met when 'there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *Id.* (quoting *Kyles v. Whitley*, 514 U.S. 419, 433 (1995)).

As with the *Giglio* claim, that Grant offered an alternative explanation for the use of these items does not show he suffered prejudice through its destruction. In the light of the significant evidence summarized by the state court, Grant did not show a reasonable probability that the result of the proceeding would have been different had the evidence of the wood panels and carpet been preserved and turned over to the defense. Thus, the state court did not unreasonably conclude that Grant failed to meet *Brady*'s materiality prong. Nor did the state court unreasonably determine that Grant failed to show his conviction was obtained in bad faith due to destruction of evidence. Grant does not show that the state court's decision was contrary to or involved an unreasonable application of clearly established federal law, or was based on an unreasonable factual determination.

The state court did not expressly address the portion of Grant's *Giglio* claim that alleged the State destroyed blood samples, but this Court assumes that the state court

denied the claim on the merits. *See Johnson*, 568 U.S. 289.[10] Grant does not show that a denial was unreasonable. He does not establish what would have been shown had the blood samples been preserved and turned over to the defense. Further, even assuming that testing revealed that the blood could have come from meat, as Grant testified, in the light of the other evidence indicating that the dogs were bred and kept on the properties for the purpose of dogfighting, Grant does not show that this evidence was material under *Brady*. Grant does not show that the state court's ruling was contrary to or involved an unreasonable application of clearly established federal law, or was based on an unreasonable factual determination. Grant is not entitled to relief on Ground Four.

### 10. Ground Ten (A)

Grant argues that counsel should have moved for a statement of particulars and a probable cause hearing. Regarding the statement of particulars, he contends that counsel should have sought the dates, times, and locations of dog fighting events. The state court denied Grant's claim. The state court found that since the charges were based on Grant's possessing the dogs for the purpose of animal fighting or baiting, the date of the offense was the date the dogs were recovered. (Doc. 9-8, Ex. 19, p. 118.) Thus, the state court

---

[10] Even if the state court overlooked the claim, Grant's claim fails under de novo review for the same reasons addressed in the body of the order.

found that the prosecution did not have to prove when or whether dogfighting took place.

(*Id.*)

The state court also found that Grant was not entitled to a probable cause hearing. (*Id.*) The state court found that, to the extent Grant referred to "an adversarial preliminary hearing," such a hearing would not have been necessary because fewer than 21 days passed between Grant's arrest and the filing of charges against him. (*Id.*) *See* Fla. R. Crim. P. 3.133(b)(1) ("A defendant who is not charged in an information or indictment within 21 days from the date of arrest or service of the capias on him or her shall have a right to an adversary preliminary hearing on any felony charge then pending against the defendant."). The state court concluded that Grant failed to show either deficient performance of counsel or prejudice. (*Id.*)

Grant does not show this ruling was an unreasonable application of *Strickland*. The issues underlying Grant's ineffective assistance claim are state law matters involving the elements of the offense of animal fighting or baiting and the availability of an adversary preliminary hearing. The state court determined that a statement of particulars regarding instances of dogfighting events was not needed because such evidence did not have to establish animal fighting or baiting, and that Grant was not entitled to a particular hearing governed by state procedural rules. This Court must defer to the state court's determination

of state law in reviewing his ineffective assistance claim. *See Pinkney*, 876 F.3d at 1295. Grant is not entitled to relief.

### 11. Ground Ten (B)

Grant argues that counsel was ineffective for not validating the search warrant and items found. He states that counsel "should have validated the search warrants after the illegal entry and all alleged evidence that Det. Scarborough claims to see before applying for a search warrant was not preserved, but destroyed." (Doc. 1, p. 17.)

The state court denied Grant's claim. The state court found that the information in the affidavit, "taken as a whole, provides sufficient probable cause to support the issuance of search warrants for the Defendant's properties." (Doc. 9-8, Ex. 19, p. 118.) The state court noted that it was unnecessary to include pictures in the search warrant application and that when the search warrant was issued, there had not been a ruling on the legality of the initial entry. (*Id.*) The state court also concluded that a motion to dismiss based on the destruction of the wood panels and carpet would not have been granted, and that the State did not have to test the apparent blood spots. (*Id.*) The state court concluded that Grant failed to establish either deficient performance or prejudice. (*Id.*)

Grant does not show entitlement to relief. He does not show that the state court unreasonably determined that the affidavit contained information sufficient to establish probable cause. Further, while Grant appears to argue that counsel should have moved to

dismiss the charges after "validat[ing]" the warrant, the state court determined that a motion to dismiss would not have been granted. Whether a motion to dismiss would have succeeded is a matter of state law and this Court must defer to the state court's determination that the motion would have been denied. *See Pinkney*, 876 F.3d at 1295. Grant has not met his burden of showing that the state court unreasonably applied *Strickland* or unreasonably determined the facts in denying his ineffective assistance claim.

### 12. Ground Ten (C)

Grant asserts that counsel should have moved for a mistrial on counts 39 through 42, which charged animal fighting or baiting. In his postconviction motion, Grant argued that these dogs were kept on chains, not in pens, and that "[a]ll violations of Fla. Stat. § 822.122 are dogs in pens or houses." (Doc. 9-7, Ex. 19, p. 55.) He claimed that Deputy Losciale's testimony shows the dogs were on chains and that the proceedings therefore involved "serious misconduct by the State and trial judge." (*Id.*)

The state court denied this claim, finding that based on the dogs' lacerations and scarring, the jury could have properly concluded that Grant possessed each dog for the purpose of fighting or baiting. (Doc. 9-8, Ex. 19, p. 119.) Thus, the court found that a mistrial would not have been granted. (*Id.*)

The state court did not unreasonably deny Grant's claim by finding that the evidence allowed the jury to find that Grant possessed the dogs for the purpose of animal fighting

or baiting. A person who knowingly engages in "baiting, breeding, training, transporting, selling, owning, possessing or using any wild or domestic animal for the purpose of animal fighting or baiting" commits the third-degree felony of animal fighting or baiting. § 828.122(3)(a), Fla. Stat.

Dog 39's collar was rubbing its neck and it had scarring on its hind legs. (Doc. 9-3, Ex. 1d, pp. 591-92.) Dr. DeGroat observed scars and a laceration on dog 40 that were consistent with bite marks. (*Id.*, p. 593.) She also stated that dog 41 had abrasions and lacerations consistent with dog bites and in various stages of healing. (*Id.*, pp. 614-15.) Dr. DeGroat found that dog 42's scarring was consistent with dogfighting. (*Id.*, p. 616.) In addition, the statute under which Grant was charged does not require that dogs be kept in pens or dog houses before a person may be charged with animal fighting or baiting. *See* § 828.122(3)(a), Fla. Stat.

The Court notes that when Dr. DeGroat was asked if a photo depicted scarring on dog 39's hind legs, she stated, "Yes. That's from the collar." (Doc. 9-3, Ex. 1d, p. 592.) As Dr. DeGroat looked at a succession of photographs during her testimony, it is not apparent that her statement, "That's from the collar" was actually referring to the scars on dog 39's hind legs. But to the extent her answer, as read on the face of the trial transcript, suggests that the scars might not have been from fighting or baiting activities, and the state court's order was therefore based on an unreasonable factual determination as to dog 39, Grant

would be entitled to de novo review. *See Daniel v. Comm'r, Ala. Dep't of Corr.*, 822 F.3d 1248, 1260 (11th Cir. 2016) (stating that a court undertakes a de novo review upon determining that the state court decision is unreasonable under § 2254(d)).

But Grant is not entitled to relief even under de novo review. There was still sufficient evidence to support the animal fighting charge regarding dog 39. As addressed, that the dog was kept on a chain did not prevent a conviction for animal fighting or baiting. Further, Grant did not deny owning and possessing the dogs. Dog 39 was kept with many other dogs on the property that contained significant evidence of dog fighting activities, and dog 39 had similar health issues to many other dogs on the property.[11] And Dr. DeGroat testified to her conclusion that all the dogs were possessed or bred for dogfighting. (Doc. 9-3, Ex. 1d, pp. 626-27.) Given the overall environment and circumstances in which dog 39 was found, Grant does not show that there was any basis for counsel to move for a mistrial based on the charge of animal fighting or baiting for dog 39. A mistrial is appropriate only when "an error is so prejudicial as to vitiate the entire trial." *Williams v. State*, 209 So.3d 543, 560 (Fla. 2017) (quoting *Smith v. State*, 170 So.3d 745, 757 (Fla. 2015)). Grant is not entitled to relief.

Accordingly, Grant is not entitled to relief on any part of Ground Ten.

---

[11]  In addition to the scarring and the rubbing from the collar, dog 39 scored a 3 on the body composition scale and had a "severe" flea infestation that caused the dog to scratch to the point it "mutilate[ed]" itself under its ear. (Doc. 9-3, Ex. 1d, pp. 591-92.)

## V.   <u>CERTIFICATE OF APPEALABILITY</u>

A prisoner seeking a writ of habeas corpus has no absolute entitlement to appeal a district court's denial of his petition. 28 U.S.C. § 2253(c)(1). Instead, a district court or court of appeals must first issue a certificate of appealability (COA). *Id.* "A [COA] may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To obtain a COA, Grant must show that reasonable jurists would find debatable both the merits of the underlying claims and the procedural issues he seeks to raise. *See Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Grant has not made the requisite showing.[12] Finally, because Grant is not entitled to a COA, he is not entitled to appeal in forma pauperis.

It is therefore **ORDERED** that Grant's Petition for Writ of Habeas Corpus, (Doc. 1), is **DISMISSED-IN-PART** for lack of jurisdiction and **DENIED-IN-PART**. The **CLERK** is directed to enter judgment against Grant and in Respondent's favor and to **CLOSE** this case.

**ORDERED** in Tampa, Florida, on March 17, 2023.

Kathryn Kimball Mizelle
United States District Judge

---

[12] The denial of a COA is limited to the claims over which this Court has jurisdiction. *See, e.g.*, *Williams v. Chatman*, 510 F.3d 1290, 1295 (11th Cir. 2007) (stating in the context of a second or successive § 2254 petition that the district court could not issue a COA when it lacked jurisdiction over the successive petition).